1

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF HAWAII

 3
       UNITED STATES OF AMERICA,    ) CR 05-00027 JMS
 4                                  )
                   Plaintiff,       ) Honolulu, Hawaii
 5                                  ) March 3, 2006
              vs.                   ) 9:30 a.m.
 6                                  )
       (02) ERIC K. HOE,            ) 1) Sentencing to Count 1 of
 7                                  ) the First Superseding
                   Defendant.       ) Indictment
 8     _____) 2) Plaintiff United States
                                    )    of America's Motion for
 9                                       Downward Departure

10                    TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE J. MICHAEL SEABRIGHT
11                  UNITED STATES DISTRICT JUDGE

12     APPEARANCES:
       For the Plaintiff:        MARK A. INCIONG, ESQ.
13                               Office of the United States Attorney
                                 PJKK Federal Building
14                               300 Ala Moana Blvd., Suite 6100
                                 Honolulu, Hawaii  96850
15
       For the Defendant         CRAIG T. KIMSEL, ESQ.
16     (02) Eric K. Ho:          Attorney at Law
                                 888 Mililani Street, Suite 700
17                               Honolulu, Hawaii  96813

18     Official Court Reporter:  Sharon Ross, CSR, RPR, CRR
                                 United States District Court
19                               300 Ala Moana Blvd., Room C-283
                                 Honolulu, Hawaii  96850
20                               (808) 535-9200

21

22

23

24

25     Proceedings recorded by machine shorthand, transcript produced
       with computer-aided transcription (CAT).
```

## EXHIBIT C

1    FRIDAY, MARCH 3, 2006                          9:30 A.M.

2          COURTROOM MANAGER:  Criminal No. 05-00027 JMS, United

3    States of America versus Defendant (02) Eric K. Ho.

4          This case is called for a Sentencing as to Count 1 of

09:52AM 5    the First Superseding Indictment.

6          MR. INCIONG:  Good morning, Your Honor.  Mark Inciong

7    for the United States.

8          THE COURT:  Yes, good morning.

9          MR. KIMSEL:  Good morning, Your Honor.  Craig Kimsel

09:52AM 10    for Eric Ho.  He's present next to me.

11          THE COURT:  All right.  Good morning.  And for the

12    record, Mr. Kimsel, I did receive a series of letters from you

13    this morning, including a letter -- two-page letter from Mr. Ho

14    and a series of other letters which I have read in chambers

09:52AM 15    before coming out.

16          MR. KIMSEL:  Thank you, Judge.

17          THE COURT:  All right.  Let me first ask you then,

18    Mr. Kimsel and Mr. Ho, if you've both had an opportunity to

19    read, review and discuss the presentence report and any

09:52AM 20    addendum and make any and all objections you wish to the

21    report.

22          MR. KIMSEL:  Yes, Your Honor.  We've -- I've gone over

23    it with Mr. Ho over at the Federal Detention Center.  We made

24    objections which are included within the report.  We have no

09:53AM 25    further objections to it.

```
 1              THE COURT:  All right.  Is that correct, Mr. Ho?
 2              THE DEFENDANT:  Yes.
 3              THE COURT:  All right.  Thank you.  You may be seated.
 4              On September 30th of 2005, Mr. Ho pled guilty to
09:53AM  5   Count 1 of the first superseding indictment charging him with
 6   conspiracy to possess with intent to distribute 50 grams or
 7   more of methamphetamine.
 8              Now, I have read the presentence investigation report;
 9   and at this time I will accept the Rule 11(c)(1)(A) plea
09:53AM 10   agreement because I am satisfied that the agreement adequately
11   reflects the actual offense behavior and accepting the
12   agreement will not undermine the statutory purposes of
13   sentencing.
14              I will place the report itself under seal in the
09:53AM 15   record.  If an appeal is taken, of course, counsel will have
16   access to the report other than the confidential recommendation
17   section.
18              All right.  Now, turning to the report, I understand,
19   as to the factual findings in the report, not the guideline
09:54AM 20   calculations, but the factual findings, neither party has any
21   objections; is that accurate?
22              MR. KIMSEL:  That's correct, Your Honor.  We have no
23   objections.
24              MR. INCIONG:  That's correct, Your Honor.
09:54AM 25              THE COURT:  All right.  As to the application of the
```

4

1    guidelines to the facts, Mr. Inciong, I understand the

2    government has no objections?

3             MR. INCIONG:  No objections.

4             THE COURT:  All right.  Now, Mr. Kimsel, you did make

09:54AM 5    an objection regarding Paragraphs 38 and 40 relating to two

6    prior convictions and Judge Del Rosario's subsequent ruling

7    that wasn't reflected in the initial report.

8             Has that been satisfied?  Has that been corrected to

9    your satisfaction at this point?

09:54AM 10            MR. KIMSEL:  Yes, Your -- yes, it has, Your Honor.  I

11   believe it did not change the initial calculations of the

12   guideline, but I thought it was important to have at least the

13   correct disposition of the case reflected in the PSI --

14            THE COURT:  Well, so do I.

09:54AM 15            MR. KIMSEL:  -- and it has been.

16            THE COURT:  Okay.  So, you have no remaining

17   objections as to the guideline calculations then?

18            MR. KIMSEL:  None of the report, Your Honor.

19            THE COURT:  All right.

09:54AM 20            MR. KIMSEL:  We will be asking for a further downward

21   departure.

22            THE COURT:  I understand that; but I'm just, right

23   now, starting with where we are within the advisory guidelines.

24            MR. KIMSEL:  Yes, Your Honor.

09:55AM 25            THE COURT:  Okay.  With that, then, the Court does

1    adopt the factual findings in the presentence report as its own

2    and the conclusions as to applicable guidelines as its own.

3        So, the Court determines that the applicable advisory

4    guidelines are as follows:  Total offense level, 34; criminal

09:55AM  5    history category VI; a guideline advisory imprisonment range of

6    262 months to 327 months with a 20-year mandatory minimum.

7    Supervised release is ten years, and that's a mandatory

8    minimum.

9        If I grant the government's motion for downward

09:55AM 10    departure, of course, I can go below the mandatory minimum both

11    for the prison term and supervised release.

12        Fine range is $17,500 to 8 million, and there's a

13    mandatory $100 special assessment.

14        Do both counsel concur with those advisory guideline

09:55AM 15    ranges and mandatory minimums?

16        MR. INCIONG:  Yes, Your Honor.

17        MR. KIMSEL:  For Eric Ho, yes, Your Honor.

18        THE COURT:  All right.  Now, Mr. Inciong, I'll hear

19    from you first, then, on the motion for downward departure.

09:56AM 20        MR. INCIONG:  Your Honor, we would ask that you grant

21    our motion for a downward departure pursuant to Section 5K1.1

22    for the defendant's substantial assistance.  As stated in our

23    papers, we believe that his assistance resulted, in part, in

24    the guilty plea by co-defendant No. 3, who is Zuleika Carter.

09:56AM 25    So, we are asking for a two-level downward departure and --

1    which would also then affect the 20-year mandatory minimum that

2    is applicable at this time.

3            THE COURT:  All right.  Mr. Kimsel, just on whether to

4    grant the motion or not, do you have anything to add?  I'm

09:56AM 5    prepared to --

6            MR. KIMSEL:  Please, Your Honor.

7            THE COURT:  Okay.  With that plea, then I will grant

8    the motion.  So, the motion for downward departure is granted.

9            Now, what that does, of course, is it essentially

09:56AM 10   visciates the mandatory minimum in this case which allows the

11    Court and gives the Court discretion it would not otherwise

12    have to sentence below the 20-year mandatory minimum.

13            What I will do now, Mr. Kimsel, is hear from you on

14    your allocution on behalf of Mr. Ho; and then I'll hear from

09:57AM 15   Mr. Ho and then from Mr. Inciong.

16            MR. KIMSEL:  Thank you, Your Honor.  Your Honor, we're

17    asking that you depart further downward in this matter.  Eric

18    Ho, from the beginning, has cooperated.  I believe that's

19    reflected within the presentence investigation report.  He

09:57AM 20   immediately made a statement implicating Zuleika Carter who

21    wasn't just his co-defendant either.  This is his long-time

22    companion.  They have a child together that was born while the

23    defendant's been in custody.  It was a difficult decision for

24    him to make, but it shows that he's taken the right steps.

09:57AM 25           You know, he's lived a life -- it's unfortunate,

1    really.  You know, it's sad.  You know, I mean, he was born

2    into a -- Don Ho's family -- you know, that's his

3    grandfather -- to his -- Don Ho's daughter at an early age.  I

4    believe that's reflected in her letter.

09:58AM  5         His upbringing -- during his -- during his upbringing,

6    he didn't have much contact with his mother because she was

7    always off doing her thing, which is, I believe, related to

8    drugs also.  And that's the kind of background he's come from.

9         He got in some trouble in '91 in those burglary cases

09:58AM  10   and a drug possession case; but since '91 when he was convicted

11   of the three crimes that make him a repeat -- well, a career

12   criminal, basically, he's not had any other serious charges

13   brought against him.  That was a long time ago.

14        And even back then -- and that's why I thought it was

09:58AM  15   important to have the PSI corrected to reflect that he was

16   placed back on probation by Judge Del Rosario.  Having been

17   given an open term, the judge saw in him something that made

18   him believe that Eric could -- could benefit with something

19   less than a ten-year prison term and put him back on the five

09:59AM  20   years of probation, which he completed.

21        THE COURT:  He may have been better off with the ten

22   years.  He wouldn't be here today facing over 20 years.

23        MR. KIMSEL:  I understand that, Judge.

24        I guess my point is that Eric -- he can do well.  It's

09:59AM  25   in him.  You know, he's -- and he did well.  That's why the --

1    Judge Del Rosario reconsidered it, waited a year to see how he

2    did when he was in custody, was satisfied that Eric was making

3    the right improvements and put him back on probation.

4    You know, the fact that he was caught with these

09:59AM 5    drugs, it was probably the best thing that ever happened to

6    him, you know? I mean, how could that be, you know? Well, it

7    finally put an end in his life to this other world that he

8    lived in, you know, this drug world.

9    He believed himself almost to be invincible. You

10:00AM 10    know, I believe that's part of the addiction to crystal

11    methamphetamine. It gives the person using it a sense that

12    everything -- they're untouchable basically, Teflon on them.

13    And Eric's now gotten out from underneath that, and

14    he's going to pay for it. I mean, he pled guilty in this case

10:00AM 15    pursuant to a plea agreement that required -- that was -- the

16    plea agreement was a prerequisite to his cooperation in this

17    case. And he went forward; and he took the plea agreement so

18    that he could cooperate, knowing full well that there was no

19    guarantees of anything on the government's side, that he was

10:00AM 20    facing a 20-year mandatory minimum. But he put his faith in it

21    and he moved forward with it and he pled guilty before this

22    Court, knowing full well those ramifications.

23    So, the fact that he took out his girlfriend in this

24    case and implicated her was really something more than a

10:01AM 25    two-level downward departure should reflect. It was a -- it

1    was a point in his life where he has to put aside his personal

2    relationships, his drug culture, his immersion in that, and he

3    stepped out of it.

4         And he's -- since then he's tried to do the right

10:01AM  5    thing.  We've tried to cooperate with the government.  He

6    hasn't been able to.  I mean, it's always difficult for

7    somebody who's in custody to do anything to get greater

8    downward departures.

9         And then he had a tragedy of timing with his

10:01AM  10    cooperation.  I mean, we were ready to cooperate earlier on.

11    We might have been able to do something substantial, but then

12    he got in some administrative trouble at the FDC and was

13    precluded from coming out to cooperate.

14         And when that finally lifted, his girlfriend took a

10:02AM  15    run for it.  Zuleika Carter ran.  And so, that just destroyed

16    all of his opportunities to further cooperate until recently.

17         We did debrief last week at the FDC with an FBI agent.

18    I have received a letter this morning that is on my desk; and

19    from my -- what I understand, it's -- there's a good

10:02AM  20    possibility that Mr. Ho could testify in that matter.

21         THE COURT:  In the Carter --

22         MR. KIMSEL:  That's correct -- in Corn, in the Corn

23    matter.  And I believe it's U.S. versus James Corn.

24         THE COURT:  Oh, okay.

10:02AM  25         MR. KIMSEL:  Yeah.

1          THE COURT:  Where is Ms. Carter now?  What's her

2    status?

3          MR. KIMSEL:  I believe she's in state custody -- but

4    I'm not really sure -- is what I understood.

10:02AM 5          MR. INCIONG:  She is, Your Honor.  She was arrested

6    for some state forgery charges.  She's in custody on that

7    charge.  There's, of course, a writ as soon as she's done with

8    that matter to be brought into federal custody where she is

9    pending sentencing.

10:03AM 10          THE COURT:  Right.  Okay.

11          MR. KIMSEL:  So, throughout this case, Eric's tried to

12    cooperate; and perhaps here at the end he may have gotten

13    something that the government can use.  I mean, he's been at

14    the doorstep.  He's thrown himself on the mercy of the United

10:03AM 15    States in this matter on the two-level downward departure that

16    they're asking for.

17          He also suffers -- I want to point this out; but he

18    also suffers from a disease that he got from his mother's side

19    of the family -- or, I'm sorry, his father's side of the family

10:03AM 20    called Joseph's disease.  And it makes Mr. Ho difficult to

21    understand at times as if his tongue is swollen.  It slowly

22    deteriorates the body.  His father died -- his grandfather died

23    from it.

24          (Counsel and the Defendant confer.)

10:03AM 25          MR. KIMSEL:  Yeah, his grandfather died from the

1    disease.  It is terminal.  And he's got to face that, too,

2    while serving a lengthy prison sentence.

3         It all -- you know, Your Honor, we're asking that you

4    sentence Eric to a ten-year term of imprisonment.  That is a

10:04AM  5    long time; but it would reflect the fact that he believes in

6    himself that he could move forward in this world outside of the

7    drug culture that he's been in.  And I believe it would reflect

8    the seriousness of his offense, and it would suit the pursuit

9    of justice in this case.

10:04AM 10         THE COURT:  All right.  Mr. Ho, this is your

11    opportunity to address the Court.

12         THE DEFENDANT:  I have to start out apologizing for

13    what brought me here.  I was wrong, and it will never ever

14    happen again.

10:05AM 15         Since 1990 -- that was my last felony charges that I

16    committed, and since then I feel like I have -- I have changed.

17         My grandpa was supposed to be here today; but I guess

18    he had a heart attack, you know, that heart attack.  He fell in

19    his -- while he was eating, and he busted his head.  He's in

10:05AM 20    the hospital again.

21         But it wasn't easy growing up in that family.  It was

22    like a business, a lot of drugs around.  My initial drug charge

23    that I'm being -- that's being used against me was from 1990.

24    And I was put on probation, but I kept violating my probation

10:06AM 25    by using -- using drugs.  And that's another disease in itself.

1          And I have two -- two boys that I love, and I've been
2     there for them.  I made a big mistake.  I'd like to ask for the
3     mercy of this -- of the Court.
4          It's -- I'll do -- I'll cooperate -- I'll do anything
10:06AM 5     for the Federal Government to help reduce my time.  It was hard
6     for me to debrief on my girlfriend.  We're still together; but
7     when the agents came and debriefed me, they wanted my honesty
8     and -- which I -- which I was completely honest with them.
9          And that disease that he talks about, it's a
10:07AM 10    neurological disorder where it -- first, it takes your speech.
11    That's what -- I always speak like this.  My -- my slurred
12    speech is a symptom of the disease.  And it progresses -- from
13    age 31 to 37 is when the symptoms really hit you.  It's an
14    incurable disease.  It's called Joseph-Machado disease.  And
10:07AM 15    your vision starts going, and your coordination goes.
16          And I never -- I was never really diagnosed with it
17    because when I went to doctors, they don't really know much
18    about it; but it's starting to hit now, if you look on the
19    Internet and stuff.
10:08AM 20          But my dad is dying from it.  His dad died from it,
21    and his brother died from it also.  So, it's a -- it's a
22    disease that I'd like to try and address in prison, find some
23    kind of medication for it but -- whatever can be found.
24          But I just ask for your understanding and your
10:08AM 25    fairness.  I'm not a stupid guy.  I'm intelligent.  Like I

1    said, my -- I always talk like this.  It's because of the

2    disease, the slurred speech.

3         And I heard that there's three classes of the disease,

4    A, B and C.  And B is -- the B class is what I think I have.

10:08AM  5    It progresses from 31 to 37; and by 45, even, you're bedridden.

6    And that's -- that, I think, is the one I have because the

7    symptoms are going rapidly on me.

8         But -- and the drugs didn't help.  And I just -- I

9    never going to touch that stuff ever again, never again, never

10:09AM  10   ever again.  I hate -- I hate what the drugs did to me, what

11   they do to me; and I just ask for your mercy.

12        THE COURT:  All right.  Thank you, Mr. Ho.

13        Mr. Inciong?

14        MR. INCIONG:  Thank you, Your Honor, just a few points

10:09AM  15   to address, Your Honor.

16        In regard to the defendant's criminal history, while

17   it's true that his last conviction -- scoreable conviction was

18   1991, I mean, it's difficult to -- to rack up that kind of

19   criminal history and to become a career offender.  I mean,

10:10AM  20   that's something you earn over a period of time.

21        So, in addition to that, you know, I don't really

22   agree with the fact that well -- you know, my last conviction

23   was 15 years ago, you know, that I've been basically -- the

24   insinuation being I've been a model citizen since then.  I

10:10AM  25   mean, obviously Mr. Ho was engaged in the drug distribution of,

1    you know, significant quantities for an extended period of time

2    before he was arrested.  So, I don't think there was this, you

3    know, long gap of model or noncriminal behavior that can really

4    be pointed to.

10:10AM  5         In regard to, you know, his family situation, I mean,

6    I have no doubt there were -- there were difficulties there

7    that Mr. Ho encountered and so forth; but, you know, the

8    argument could also be made that Mr. Ho had privileges and

9    opportunities that a lot of people didn't have by growing up in

10:10AM 10    that family as well.  So, I don't think that's necessarily a

11    basis to depart downward either.

12         In regard to his cooperation, I mean, you know, I

13    truly believe Mr. Ho did everything that he could.  There were

14    in this case, I think, opportunities for -- for much greater

10:11AM 15    assistance than he gave; but through, you know, faults of his

16    own -- and he -- Mr. Ho at times just couldn't tow the line.

17    And those opportunities dropped by the wayside as time went by.

18         I'm sure it was difficult for him to, you know,

19    basically dime out his girlfriend; but, again, I don't think

10:11AM 20    that enters into the calculation.  I mean, the substantial

21    assistance is in the results; and I don't think necessarily who

22    you're cooperating against, by family relation or otherwise, is

23    really something that enters into that.

24         You know, Mr. Carillo, his co-defendant, was -- he's

10:11AM 25    already been sentenced.  The government recommended six levels

1    for his cooperation, which ended up being something like in the

2    neighborhood of 23 months, I think, is what it dropped his

3    sentence down to.

4            THE COURT:  Well, I think it was higher than that.  I

10:12AM  5    looked it up this morning.  37 months.

6            MR. INCIONG:  37 months.

7            THE COURT:  But, of course, he had --

8            MR. INCIONG:  Well, I mean, 37 months is what he got;

9    but he was facing 70 so --

10:12AM 10            THE COURT:  Well, I think his was 70 to 87 months.

11            MR. INCIONG:  Right.  So, it was about a 23 -- you

12    know, he got about a couple years in credit.  So, Mr. Ho --

13    although, you know, obviously he's facing much more time, part

14    of that is due to his criminal history.  Even though it's two

10:12AM 15    levels, the actual time off is going to be much greater than

16    Mr. Carillo got, who assisted the government more

17    significantly.  So, we think the two levels is appropriate at

18    this time.

19            There, you know, appear to be other further

10:12AM 20    opportunities which are still available in this other case that

21    the government will address happily with a Rule 35, if they

22    should pan out.

23            I have -- I do not object to sentencing Mr. Low to

24    the -- Mr. Ho to the low end of the range that we have

10:13AM 25    recommended, which is 210 months.  I think that, you know, more

1    than adequately covers any of the points that he brought up

2    today, which I don't think individually substantiate any

3    downward departure; but maybe collectively they do. So, we

4    don't have any objection to the low end based on that. So, our

10:13AM  5    recommendation is 210 months.

6         THE COURT: All right. You don't dispute the medical

7    condition, I take it?

8         MR. INCIONG: Well -- and thank you. I did want to

9    address that. I -- and that's one thing I will leave with the

10:13AM 10   Court because I don't dispute that at all. I don't know a lot

11   about the disease; but it sounds, you know, like it's -- it's

12   obviously a hereditary disease that it's just going to be a

13   matter of time that Mr. Ho is going to have to deal with a --

14        THE COURT: Okay.

10:13AM 15        MR. INCIONG: -- a more serious consequence.

16        THE COURT: All right. All right. Thank you,

17   Mr. Inciong.

18        Mr. Kimsel, I'll give you the last word, if you wish.

19        MR. KIMSEL: Your Honor, I think Mr. Ho says that, you

10:13AM 20   know, better than I ever could, you know, about his remorse,

21   having gone down this road, what brought him here before you.

22   I think him to be sincere in his pledge never to repeat the

23   conduct that brought him here. I think he'll do his time as a

24   model prisoner.

10:14AM 25        And he'll do a lot of time. You know, we're not --

1   even what I'm asking for is a lot of time.  And we'd just ask

2   the Court take all that into consideration and -- and give him

3   a sentence that is fair and just.

4          THE COURT:  All right.  Thank you.

10:14AM 5          All right.  Well, I have looked at all of this,

6   obviously, in chambers.  The one factor I was unaware of in any

7   detail until today was the -- I don't know the full name --

8   Joseph's disease.

9          THE DEFENDANT:  Joseph-Machado.

10:14AM 10          THE COURT:  Machado.

11          THE DEFENDANT:  Joseph -- Joseph-Machado disease.

12          THE COURT:  Machado disease.

13          THE DEFENDANT:  Yeah.

14          THE COURT:  And in looking at that, Mr. Inciong, I

10:14AM 15   think, if there's no downward departure motion, I might go down

16   closer to the 240 months as a result of that.  I just think a

17   sentence over 20 years with someone of Mr. Ho's age with this

18   disease, looking at 3553(a), there really wouldn't be a need, I

19   think, to go below -- below that.

10:15AM 20          Now, my understanding of the law -- and both of you

21   can speak up if you think I'm wrong about this -- I really

22   can't consider that in going below 240 months.  In other words,

23   I think -- I think I'm limited in the departure motion from

24   that point down.  I think it's fair for me to consider the

10:15AM 25   personal characteristics and so forth going down to 240, within

1    that guideline range, looking at 3553.  I don't know that

2    that's really a fair consideration below 240 because the only

3    thing that gives me authority to go below 240 is the

4    government's motion for downward departure based on substantial

10:15AM  5    assistance.

6         So, I think I need to base then the amount of

7    departure based on the assistance.  What I'm saying is I think

8    I can consider these 3553(a) factors to get down to a mandatory

9    minimum of 240 months, which I would do without a motion.  I

10:16AM  10    would sentence him to 240 months.

11         From there going down forward, though, I think really

12    I'm limited legally to considering the substantial assistance.

13    Does anyone disagree with that as a matter of law?

14         MR. INCIONG:  I don't disagree, Your Honor.  I think

10:16AM  15    that's correct.

16         MR. KIMSEL:  Well, Your Honor, I would disagree with

17    that.  You know, I think the Court has the discretion to

18    consider whatever factors it deems appropriate in crafting a

19    down -- once the government's moved -- and it's their sole

10:16AM  20    discretion to so move for the downward departure originally.

21    Once they've done so, I believe the Court can consider any

22    factors it deems relevant in giving a further downward

23    departure to Mr. Ho.  I don't believe the Court's constrained

24    just to go down to the 20-year mandatory, that the government's

10:16AM  25    motion allows the Court to escape underneath that.

1         THE COURT:  All right.  Well, I disagree.  I think

2    that where a mandatory minimum is in play, the Court can use

3    its discretion to get to that mandatory minimum.  And below

4    that -- I'm authorized to sentence below that because the

10:17AM  5    government has filed a motion based on substantial assistance.

6    And so, I'm looking at essentially departing downward from 240

7    months then, Mr. Inciong, is the way I'm looking at it for

8    purposes of this.

9         And so, what I will do is state my intended sentence,

10:17AM 10    Mr. Kimsel, based on that.  So, based on the information

11    provided to me from Mr. Inciong and from yourself and your

12    client regarding the cooperation, the Court is intending to

13    sentence Mr. Ho to 180 months of incarceration.

14         That's to be followed -- now, I'm no longer tied to

10:17AM 15    the ten years of supervised release.  That just seems to me too

16    long in this case.  So, I'm going to say five years of

17    supervised release; no fine because I don't believe that Mr. Ho

18    has the ability to pay a fine and -- or part of the costs of

19    incarceration or supervised release and to impose a fine would

10:17AM 20    simply be an undo hardship on him; a $100 special assessment

21    and conditions of supervision as follows:

22         One, that he abide by the standard conditions of

23    supervision; two, that he not commit any crimes, federal, state

24    or local; three, that he not possess illegal controlled

10:18AM 25    substances; four, that he cooperate in the collection of DNA as

1    directed by the Probation Office; five, that he refrain from

2    any unlawful use of a controlled substance and shall submit to

3    one drug test within 15 days of commencement of supervision and

4    at least two drug tests thereafter, but no more than 15 valid

10:18AM  5    drug tests per month during the term of supervision; six, that

6    he participate in and comply with substance abuse treatment,

7    which includes drug and alcohol testing, in a program approved

8    by the Probation Office and is to refrain from the possession

9    and/or use of alcohol while participating in substance abuse

10:18AM 10    treatment.

11          I notice the condition is not here about possession of

12    a firearm, ammunition or destructive device.

13          PROBATION OFFICER:  Right.  I'm sorry, Your Honor.

14          THE COURT:  Yeah, I think that was just a mistake.

10:18AM 15    So, you shall not possess a firearm, ammunition or any other

16    type of destructive device.  And you shall submit your person,

17    residence, place of employment or vehicle to a search conducted

18    by U.S. Probation at a reasonable time and in a reasonable

19    manner based upon reasonable suspicion of contraband or

10:19AM 20    evidence of a violation of a condition of supervision.  Failure

21    to submit to a search may be grounds for revocation.  And

22    Mr. Ho shall warn any other resident that the premises may be

23    subject to search pursuant to this condition.

24          Now, what I've looked at in going down from the 240

10:19AM 25    months is -- I think Mr. Inciong is generally correct that who

1    he cooperated against -- it was a girlfriend -- isn't an

2    overriding factor certainly; but I do take into account that

3    Mr. Ho cooperated early.  And I'm sure it wasn't easy to

4    cooperate against a girlfriend.  That's got to be more

10:19AM  5    difficult than cooperating against someone out there that you

6    don't know.

7         So, I do believe that there is some additional credit

8    to be given him; and I certainly want to send the message out

9    that those that cooperate early and earnestly and against

10:20AM  10   everyone available, including someone like a girlfriend, will

11   receive credit for that.  I think that's an appropriate message

12   to send that the Court does take that sort of matter into

13   consideration.

14        But certainly the departure is not a -- you know, 50

10:20AM  15   percent departure, it's nothing of that sort.  I'm not going

16   down to the ten years you sought, Mr. Kimsel.

17        MR. KIMSEL:  Yes, Your Honor.

18        THE COURT:  I just don't think, in considering the

19   factors in 3553(a) and looking at the cooperation actually

10:20AM  20   provided here, that a sentence of -- in the range of ten years

21   is appropriate either.  So, I do find 180 months to be

22   appropriate.

23        Now, does either counsel have any legal reason as to

24   why sentence should not be imposed as stated?

10:20AM  25        MR. INCIONG:  None from the government, Your Honor.

```
 1              MR. KIMSEL:  None from the defense, Your Honor.

 2              THE COURT:  All right.  So, the sentence will be

 3    imposed as stated.

 4              MR. KIMSEL:  Your Honor, we would ask that you

 5    recommend a drug program for Mr. Ho.

 6              THE COURT:  All right.  Well, we're not there quite

 7    yet.

 8              MR. KIMSEL:  Oh, thank you, Judge.

 9              THE COURT:  First of all, there are no counts to

10    dismiss, is that right, Mr. Inciong?

11              MR. INCIONG:  No, Your Honor.

12              THE COURT:  All right.

13              MR. INCIONG:  Not to this defendant.

14              THE COURT:  All right.  Let me do this first then.

15    Let me inform you, Mr. Ho, that you have entered into a plea

16    agreement which waives most of your rights to appeal your

17    sentence.  Such waivers are generally enforceable; but if you

18    plead -- believe that the appeal waiver is not enforceable or

19    if you believe that you can appeal a matter not waived in your

20    plea agreement, then you must do so within ten days of entry of

21    judgment.  Failure to file an appeal within ten days of entry

22    of judgment is a waiver of your right to appeal.  The

23    government retains its right to appeal.

24              You certainly can talk to Mr. Kimsel about that.  If

25    you can't afford counsel, one would be appointed for you free
```

1        of charge to prosecute any appeal you wish.

2               Now, what I intend to state on the form that I fill

3        out regarding recommendations is that -- that Mr. Ho is

4        suffering from this disease and for the Bureau of Prisons to

10:21AM  5        take that into account.

6               Mr. Kimsel, if you wish to provide me a letter -- and

7        you should do it quickly, by Monday, close of business -- that

8        sets forth in more detail any information regarding this

9        letter, I'll be happy to include that in what I provide to the

10:22AM 10       Bureau of Prisons.

11              MR. KIMSEL:  Yes, Your Honor, a letter addressing this

12       Joseph-Machado disease?

13              THE COURT:  That's -- that's it.  That's all I want.

14              MR. KIMSEL:  That's right.

10:22AM 15              THE COURT:  And you could have that delivered over to

16       the Court; and then I can include that in the information I

17       provide.

18              MR. KIMSEL:  Thank you, Your Honor.

19              THE COURT:  All right.  There is certainly -- there

10:22AM 20       are certainly different types of facilities, Mr. Ho.  I don't

21       know if you've looked into this.  And, you know, you may not

22       need an actual medical center at this point; and it may be that

23       you'd be designated to a facility like Terminal Island which

24       isn't a medical center and, yet, has sort of a better medical

10:22AM 25       facility than most facilities.

1        But, of course, they would progress -- keep track of

2   the disease as it progresses; and then if a medical center is

3   required, that can be looked at at that point in time.

4        MR. KIMSEL:  Thank you, Your Honor.

10:23AM 5        THE COURT:  If the disease progresses, as you feel it

6   might, to where you're actually bedridden and can't get out,

7   the Bureau of Prisons does have a compassionate release

8   statute.  The U.S. Attorney has to agree with that; but

9   typically, in my experience, if there's someone who's actually

10:23AM 10  bedridden and can't get out of bed, then Bureau of Prisons

11  doesn't want that person.  And they tend to try to use that

12  statute at that point in time.  And I think the theory is

13  you're not going to be very dangerous if you're in bed and

14  can't do anything.

10:23AM 15       And certainly I will recommend the

16  500-hour comprehensive drug program as well.

17       MR. KIMSEL:  Thank you, Judge.

18       THE COURT:  Anything else?

19       MR. KIMSEL:  Your Honor, Mr. Ho has done some research

10:23AM 20  about the facilities available in the Bureau of Prisons; and I

21  believe he'd like to address that, which facilities, perhaps,

22  he wants to -- he would ask to be put in.

23       THE DEFENDANT:  Can I request different facilities?

24       THE COURT:  Well, you can.  Although, my -- my

10:24AM 25  preference would be simply to make sure that they put you in a

1    facility that the Bureau of Prisons best believes can address

2    this particular --

3            THE DEFENDANT:  The disease.

4            THE COURT:  -- disease, right.

10:24AM 5            THE DEFENDANT:  Okay.

6            THE COURT:  I think that's the best for you.  They are

7    experts in this.  And I think once they're informed as to the

8    disease and its progression to date, that they'll be best

9    situated to make a -- make a recommendation.

10:24AM 10       My fear is if I recommend a particular place, that may

11    be inconsistent in their view; and then they won't know which

12    of the two to follow.  So, I'd be inclined just to recommend a

13    place best suited for your particular problem at this point in

14    time.

10:24AM 15          THE DEFENDANT:  Okay.

16           MR. KIMSEL:  That seems appropriate, Your Honor.

17    Thank you.

18           THE COURT:  All right.  Mr. Inciong, anything further?

19           MR. INCIONG:  Nothing further, Your Honor.

10:24AM 20         THE COURT:  Mr. Kimsel?

21           MR. KIMSEL:  Nothing further, Your Honor.

22           THE COURT:  Thank you.

23        (Proceedings concluded at 10:24 a.m.)

24

25

1                    COURT REPORTER'S CERTIFICATE

2            I, Sharon Ross, Official Court Reporter, United

3    States District Court, District of Hawaii, do herby certify

4    that the foregoing is a correct transcript from the record of

5    proceedings in the above-entitled matter.

6            DATED at Honolulu, Hawaii, June 13, 2006.

7

8                            /s/Sharon Ross

9                            SHARON ROSS

10                           CSR 432, RPR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25